IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| IN RE ROYAL AHOLD N.V. SECURITIES & ERISA LITIGATION | : : : : : : : | Civil No.: 1:03-MD-01539<br><br>ALL SECURITIES ACTIONS |

...o0o...

**MEMORANDUM**

Plaintiffs in these consolidated actions transferred here by the Judicial Panel on Multidistrict Litigation have alleged numerous securities law violations against Royal Ahold N.V. ("Royal Ahold"); its subsidiary U.S. Food Service, Inc. ("USF"); the underwriters of a September 2001 Global Offering of Royal Ahold shares; and various individuals. The claims were discussed extensively in a prior opinion, *In re Royal Ahold N.V. Securities & ERISA Litig.*, 351 F.Supp.2d 334 (D.Md. 2004), which ruled on numerous motions to dismiss directed at the consolidated amended complaint filed February 18, 2004. In particular, the defendants' motions to dismiss the Section 12(a)(2) claims arising out of the Global Offering were granted, but with leave for the plaintiffs to seek to amend, noting that "the complaint must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser." *Royal Ahold*, 351 F.Supp.2d at 406 (citing *Pinter v. Dahl*, 486 U.S. 622, 651 (1988)). On February 22, 2005, the plaintiffs filed a proposed amended complaint adding specific allegations. The defendants opposed the plaintiffs' proposed amendment, arguing that allowing the amendment would be futile because the plaintiffs had failed to plead allegations that would survive a motion to dismiss. *See Perkins v. U.S.*, 55 F.3d

910, 916 (4th Cir. 1995) (applying motion to dismiss standard to motion for leave to amend complaint). Briefing has been completed, and oral argument was heard July 13, 2005. For the reasons that follow, I will grant the plaintiffs' motion for leave to amend the Section 12(a)(2) claims against Royal Ahold, ABN AMRO Rothschild, Michiel Meurs, and Cees Van der Hoeven, but deny their request as to Merrill Lynch International and Goldman Sachs International.

The Global Offering was a firm commitment underwriting, in which three lead underwriters (ABN AMRO Rothschild, Goldman Sachs International, and Merrill Lynch International) purchased 80,500,000 common shares issued by Ahold and resold those shares to investors. The principal defect in the consolidated amended complaint was its failure to allege specifically from what entity Lead Plaintiff COPERA purchased shares of Royal Ahold stock and by whom it was solicited. COPERA has now satisfied those requirements. Paragraph 840A of the proposed amended complaint states that:

> COPERA, through its duly authorized agent, Bank of Ireland Asset Management, purchased 21,925 shares of Ahold common stock from ABN AMRO in the September 2001 Global Offering pursuant to the September 2001 Prospectus Supplement. These shares were purchased by COPERA with COPERA's funds on the offering date, September 6, 2001, at the offering price of €31.90 per share. COPERA did not pay a commission to ABN AMRO in connection with its purchase of 21,925 shares of Ahold common stock in the September 2001 Global Offering.

Further, a document has been produced and referred to by both sides that appears to reflect a purchase in the name of COPERA of 21,925 shares on September 6, 2001, at the offering price. The document lists the broker as ABN AMRO Equities U.K., Ltd., for ABN AMRO Bank, N.V. (Pls.' Status Report, Nov. 1, 2004, Ex. D.) The Bank, together with NM Rothschild & Sons, Ltd.,

comprise the joint venture ABN AMRO Rothschild ("ABN AMRO") which is named as a defendant.

Lead Underwriters object that the document does not directly identify the named defendant ABN AMRO as the seller. ABN AMRO, however, is one of the lead underwriters for the Global Offering, and its use of a broker in carrying out sales would not necessarily insulate it from liability. *See Pinter,* 486 U.S. at 644-45. In any event, at the motion to dismiss stage, COPERA's allegation that it purchased the stock from ABN AMRO is sufficient. *See Buchholtz v. Renard*, 188 F.Supp. 888, 891 (S.D.N.Y. 1960) (where defendant issued stock for resale to the public through multiple brokers, allegations that plaintiff purchased shares through the defendant's broker, without identifying which broker, were sufficient to overcome a motion to dismiss). The defendants also object that COPERA's allegation that it purchased stock "through its duly authorized agent, Bank of Ireland Asset Management" ("BOIM") is not sufficient. Again, at the motion to dismiss stage, I disagree. The precise nature of the agency relationship can be determined through discovery and resolved on a fuller factual record. The cases relied on by defendants suggest that the agent itself may have standing to sue, but do not conclusively establish that the entity whose funds the agent has used to make the purchase lacks such standing. *See, e.g., Ezra Charitable Trust v. Rent-Way, Inc*., 136 F.Supp.2d 435, 442 (W.D.Pa. 2001) (holding that investment firm had standing to sue as a "purchaser" because of its unrestricted decision-making authority regarding which securities to buy for its clients' accounts); *Lemanik S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602, 607 (S.D.N.Y. 1989) (holding that a fiduciary corporation was a purchaser within the meaning of § 12(a)(2) and was entitled to bring suit on its own behalf or on behalf of its clients); *Monetary Mgmt. Group of St. Louis, Inc. v. Kidder,*

*Peabody & Co.,* 604 F.Supp. 764, 767 (D.C. Mo. 1985) (holding that a purchaser for the purposes of § 12(a)(2) includes a representative or an agent for a purchaser); *cf. Medline Indus. Inc. v. Blunt, Ellis & Loewi, Inc.,* No. 89C 4851, 1993 WL 13436, * 3 (N.D. Ill.) (finding question of fact as to whether plaintiff qualified as purchaser for purposes of standing for securities fraud claims); *but see Congregation of the Passion, Holy Cross Conference v. Kidder Peabody & Co.,* 800 F.2d 177, 181 (7th Cir. 1986) (plaintiff lacked standing as purchaser under § 10(b) and Rule 10b-5 because it had delegated all discretion regarding investment decisions to an agent). Accordingly, Lead Plaintiff COPERA has adequately stated a claim under § 12(a)(2) against ABN AMRO as a person who "sells" a security.[1]

COPERA also added more specific allegations of solicitation against the Lead Underwriters, Royal Ahold, Van der Hoeven, and Meurs. Some relate to the so-called "road show" that directly preceded the September 6th offering. Numerous conference calls with both U.S. and European investors and investor representatives were scheduled and conducted on September 4 and 5, 2001. On September 5, 2001, both Royal Ahold (through Meurs) and ABN AMRO spoke directly with and solicited COPERA's agent BOIM. (Proposed Am. Compl. ¶ 843 R.) Similar direct conversations with other investors are alleged to have been conducted by Lead Underwriters Goldman Sachs and Merrill Lynch, as well as by Royal Ahold (through Van der Hoeven). On September 6, 2001, Meurs described Royal Ahold's involvement in the solicitation:

> We spoke to investors with a simple message. We did two fantastic takeovers, we maintain our profit expectation for this year and we say the acquisitions will contribute to earnings per share. *Trust in*

---

[1] According to *Pinter*, § 12 "imposes liability on the owner who passes title, *or other interest in the security*, to the buyer for value." 486 U.S. at 642 (emphasis added). Whether "full title" passes is not dispositive. *Id.* at 643.

4

*us and give us the money that we can immediately put to good use.*

(Proposed Am. Compl. ¶ 843T). This description, combined with the conference calls, is sufficient to allege that the "issuer's role was not the usual one; that it went further and became a vendor's agent." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (internal citation omitted); *see also Shaw v. Digital*, 82 F.3d 1194, 1215 (1st Cir. 1996).

Other allegations of solicitation which are more specific in the proposed amended complaint relate to the press releases and slide presentation describing Ahold's proposed acquisition of Bruno's and Alliant, which were included in a Form 6-K signed by Van der Hoeven on September 4, 2001. The Form 6-K was filed with the SEC and incorporated by reference in the September 2001 Prospectus Supplement, on which COPERA and BOIM allegedly relied.[2] (Proposed Am. Compl. ¶ 843 F). The plaintiffs further allege that all the Lead Underwriters "instructed" Ahold on what to include in the Form 6-K, as well as other "marketing efforts."

Meurs's involvement in the conference call with BOIM is sufficient to bring him (and Royal Ahold) within the offer or solicitation prong of § 12(a)(2). Van der Hoeven's signing of the Form 6-K used to solicit BOIM and COPERA, considered in light of his alleged involvement in planning and carrying out the road show effort and his position of responsibility as CEO of Royal Ahold, also supports a § 12(a)(2) claim. (Proposed Am. Compl. ¶ 843 Q-S.) *See, e.g., American High-Income Trust v. Alliedsignal*, 329 F.Supp.2d 534, 547 (S.D.N.Y. 2004) (finding allegations

---

[2]The word "relied" presumably is used in the complaint to imply that the documents containing the solicitation were in fact received and reviewed, at least by BOIM. Proof of "reliance" is not required to show a violation of § 12(a)(2). *Johns Hopkins University v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970).

5

that defendants helped prepare and signed the registration statement and toured the country as part of the road show sufficient to demonstrate solicitation under § 12(a)(2)); *In re American Bank Note Holographics Inc. Securities Litig.*, 93 F.Supp.2d 424, 439 (S.D.N.Y. 2000) (in a firm commitment underwriting, finding allegations that issuer actively solicited the sale of shares through participation in the preparation of the registration statement and prospectus and in road shows, with a motivation to serve its own financial interest, sufficient to show seller status). *See also Craftmatic Securities Litig. v. Kraftsow,* 890 F2d 628, 636 (3d Cir. 1989) (citing cases that hold that an issuer who directly and actively participates in the marketing and selling efforts in a firm commitment underwriting may be subject to § 12(a)(2) liability). This result is not inconsistent with *PPM America, Inc. v. Marriott Corp.*, 853 F.Supp. 860, 875 (D.Md. 1994), where the only "solicitation" activity alleged against the issuer was the making of public statements about the offering not directed at any particular investor. *Id.* Nor is it inconsistent with *Shain v. Duff & Phelps Credit Rating Co.*, 915 F.Supp. 575, 582 (S.D.N.Y. 1996), where the defendants had no direct contact with the buyer, were not alleged to have controlled the brokers who did have direct contact, and were not alleged to have "crafted, distributed or had anything to do with" the offering memoranda. *Id.* Accordingly, the motion to amend will be granted as to the § 12(a)(2) claim against ABN AMRO, Royal Ahold, Meurs, and Van der Hoeven.

The remaining questions are (1) whether COPERA has stated a solicitation claim against Goldman Sachs and Merrill Lynch based on their involvement in preparation of the 6-K and/or planning of the road shows; and (2) if it has not, should those Lead Underwriters nevertheless be held in until the class certification stage. Under the particular circumstances of this case, the answer to both questions is no. First, I note the attenuated nature of the relationship between

COPERA and the remaining two underwriters: there was no direct personal or telephone contact between Goldman Sachs or Merrill Lynch and COPERA, even through an agent.  Rather, the solicitation was indirect, consisting of advice to Royal Ahold on preparation of the 6-K and other marketing efforts.  The 6-K itself is not a document signed by the underwriters, and there is no indication the 6-K was distributed directly to COPERA, although it was seen by BOIM.

Second, I already have allowed additional time for COPERA to amend its Section 12 claims, and for this issue to be argued, and there has been no suggestion of other named plaintiffs who might have a claim against Goldman Sachs or Merrill Lynch, nor have there been any motions to intervene.  While the lead plaintiff need not have standing to assert every claim, there must ultimately be a named plaintiff with standing as to each defendant.  *See In re IPO Sec. Litig.*, 214 F.R.D. 117, 122-23 (S.D.N.Y. 2002).  *See also In re Enron Corp. Sec. & ERISA Litig.,* No. MDL-1446, 2004 WL 405886, *31-32 (S.D.Tex. 2004) (holding that in class action suits, in order to have standing under § 12(a)(2), the plaintiff must allege he was directly solicited by or purchased from the defendants); *cf. In re Worldcom*, *Inc. Securities Litig.,* 294 F.Supp. 2d 392, 423 (S.D.N.Y. 2003) (finding that allegations that the two named plaintiffs were solicited by or purchased notes from the underwriter defendants sufficient to plead standing).  As no such named plaintiff has been suggested, and it does not appear fair or efficient at this stage in this case to hold in Goldman Sachs and Merrill Lynch on the chance that some such person may appear, the motion to amend will be denied as to those defendants.  For the reasons stated above, however, the motion will be granted as to ABN AMRO, Royal Ahold, Meurs, and Van der Hoeven.

In my previous opinion granting plaintiffs leave to amend their § 12(a)(2) claims, I stated that "[t]o the extent that the plaintiffs are able to state a claim against controlled persons under §

7

12(a)(2) following leave to amend, the plaintiffs may be able to state a claim for control person liability under § 15." *In re Royal Ahold,* 351 F.Supp.2d at 410-11. I already determined that plaintiffs had alleged § 20 control person claims against Van der Hoeven, Meurs, Andreae, Miller, Tobin, and Grize. *Id.* at 410. While § 20 and § 15 employ the same definition of control, § 20 liability is premised on control over a primary violator of §10(b), while § 15 requires proof of control over a primary violator of § 12(a)(2) or § 11. Nonetheless, I conclude that the plaintiffs have adequately alleged that these same individuals served as control persons under § 15 because they "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws...[and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in [§12(a)(2)] liability." *Id.* at 409 (internal quotations and citations omitted) (emphasis added).[3]

The September 2001 Prospectus Supplement, the basis for the § 12(a)(2) claim, contained numerous false and misleading statements regarding Royal Ahold's financial status. *Id.* at 407 n.58. As explained in detail in my prior ruling on the various motions to dismiss, these misstatements resulted from the improper consolidation of joint venture revenue and the accounting irregularities and promotional allowance fraud at USF. At this stage in the litigation, the plaintiffs' allegations that the § 15 individuals exerted control, either directly or indirectly, to influence the policies and practices that resulted in the financial misstatements being published in the September 2001 Prospectus Supplement are sufficient to survive a motion to dismiss as to all

---

[3] It is only necessary to examine whether the individuals had control over Royal Ahold, a primary violator under §12(a)(2). There are no allegations as to any defendant's control over ABN AMRO Rothschild, and it makes little sense to analyze control over Meurs and Van der Hoeven, because they are separately charged with control person liability in their own capacities.

individual defendants except Grize. Van der Hoeven, Meurs, Andreae, Miller, and Tobin each served on the Royal Ahold Executive Board at relevant times leading up to the September 2001 Global Offering. According to plaintiffs, Van der Hoeven and Meurs in particular, as CEO and CFO, respectively, were actively involved in preparing the Prospectus Supplement (e.g., Van der Hoeven signed the Form 6-K incorporated by reference in the document) and participating in the promotional road show for the September 2001 Global Offering. Both Van der Hoeven and Meurs apparently then knew or were recklessly disregarding the fact that Royal Ahold's financial statements were misleading and/or omitted material information. *Id.* at 373-77. Similarly, Andreae allegedly played a direct role in drafting control letters in order to improperly consolidate joint venture revenue, and Miller allegedly encouraged or recklessly disregarded a scheme to artificially inflate USF's–and consequently Royal Ahold's–earnings. Although Tobin did not become a member of Royal Ahold's Supervisory Board until September 1, 2001, a few days before the Global Offering, he had served on Royal Ahold's Executive Board from 1998 through September 1, 2001 and as president and CEO of Ahold USA at the time of the acquisition of USF. Based on plaintiffs' allegations, he therefore allegedly was in a position to know about and help remedy the internal control problems at USF. Grize, on the other hand, is only alleged to have served on Royal Ahold's Executive Board beginning on September 1, 2001, a few days before the Global Offering. This short time period, even when considered along with the fact that he was quoted promoting the Bruno's Supermarket and Alliant acquisitions in the offering documents, does not support the allegation that he exercised control over those responsible for the material misrepresentations in Royal Ahold's earlier financial statements. *See Jacobs v. Coopers Lybrand LLP,* No. 97 Civ. 3374, 1999 WL 101772, *18 (S.D.N.Y. 1999) (dismissing § 20 claim

against a director who did not become a member of the board until 29 days before he signed the 10-K form and therefore it was "not logical to presume that ...[he] was a person able to exert control over those who wrote the material misstatements the form contained").  In sum, when construed in the light most favorable to plaintiffs, the allegations in the proposed amended complaint are sufficient to state § 15 claims against Van der Hoeven, Meurs, Andreae, Miller, and Tobin.[4]

    A separate Order follows.


     August 25, 2005                                              /s/
            Date                                              Catherine C. Blake
                                                                United States District Judge

---

[4] These individuals may effectively assert an affirmative defense to § 15 liability if they can show that they "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *See In re Microstrategy, Inc. Securities Litig.,* 115 F.Supp.2d 620, 659 (E.D.Va. 2000) (citing 15 U.S.C. § 78t(a)).